**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE AT&T MOBILITY WIRELESS | ) | |
| DATA SERVICES SALES TAX | ) | MDL No. 2147 |
| LITIGATION | ) | No. 10 C 2278 |
| | ) | Hon. Amy J. St. Eve |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Class Counsel, on behalf of the 92 attorneys who collectively represent the Class and the state-specific Subclasses, have filed a motion for approval of attorneys' fees, costs and expenses, and for approval of incentive awards for Class Representatives.[1]  (R. 124.)  For reasons explained below, the Court grants in part and denies in part Class Counsel's motion for approval of attorneys' fees.  It grants Class Counsel's motion for incentive awards in the amount of $5,000 for each Class Representative.  It also grants Class Counsel's motion for costs and expenses.

This order accompanies the Court's larger memorandum opinion and order, approving the Settlement Agreement ("the Settlement" or "the Agreement").  In the present order, the Court assumes familiarity with the facts of the case.

## LEGAL STANDARD

"In a certified class action, the court may award reasonable attorney's [*sic*] fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Pursuant to the

---

[1] The heading of the motion itself purports to seek "Approval of Incentive Awards for Class Counsel."  (R. 124 at 1.)  The Court considers the reference to "Counsel" to be mistaken, and assumes that Class Counsel meant to refer to "Representatives."

Settlement, the parties agreed that Class Counsel would "seek a fee no greater than the lesser of ten percent (10%) of the aggregate value of the settlement or twenty-five percent (25%) of the amounts refunded by Taxing Jurisdictions to the Settlement Class." (R. 50-3 at 26.)

In determining a reasonable fee, the Court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). To determine the reasonableness of the sought-after fee in this, a common-fund, case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"). The probability of success at the outset of the litigation is relevant to this inquiry. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994).

*Synthroid I* held that the "market rate for legal fees depends in part on (1) the risk of nonpayment a firm agrees to bear, in part (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case." *Synthroid I*, 264 F.3d at 721. Of course, district courts must exercise caution in focusing on the first factor, for a dogmatic application of the principle would justify large attorneys' fees for frivolous class-actions suits that defendants agreed to settle. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011) ("[T]he logic of scaling the fee to the risk leads to absurdity if pressed too hard: it would justify an astronomical fee in a frivolous suit in which the plaintiff prevailed by a fluke.") For that reason, it is only "within the set of colorable legal claims" that "a higher risk of loss . . . argue[s] for a higher fee." *Id.*

The Seventh Circuit has further explained that "[t]he object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). That court has nevertheless recognized, however, that "[s]uch estimation is inherently conjectural[.]" *Trans Union*, 629 F.3d at 744.

With respect to incentive payments, the Seventh Circuit has explained that such "awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722. Thus, if such individuals "would have stepped forward without the lure of an 'incentive award,' there is no need for such additional compensation[.]" *Id.* at 723. In deciding whether an incentive award is proper, and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The Federal Rules of Civil Procedure allow the Court, in a certified class action, to "award reasonable . . . nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Seventh Circuit has explained that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz v. W. Bend Co., Div. of Dart Indus., Inc.*, 789 F.2d 540, 553 (7th Cir. 1986) (quoting *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984)).

**DISCUSSION**

I.     **The Court Grants in Part and Denies in Part Class Counsel's Motion for Attorneys' Fees Equating to the Lesser of 25% of the Cash Recovered in each Subfund and 10% of the Aggregate Value of the Settlement to each Subclass**

A.     **The Requested Fees**

Class Counsel seek fees in the amount of "the *lesser* of 10% of the aggregate value of the relief obtained for each Subclass or 25% of the actual cash recovered for each Subclass."  (R. 124 at 1) (emphasis in original).

Dr. Landes estimated at the fairness hearing that the Settlement will create approximately $1.98 billion in going-forward relief to the Class Members.[2]  Class Counsel have filed refund requests in the amount of $1.159 billion, which they estimate to amount to a maximum possible return of $956,160,000, in light of applicable statutes of limitations, which will time bar some claims.  (R. 163 at 23; R. 164 at 14; R. 164-1 at 9.)

If they succeed in recovering every cent of this sought-after amount, Counsel would earn an award in the amount of $239,040,000 under their proposed fee.  (R. 164 at 14.)  This figure would represent 25% of the actual cash recovered.  The aggregate value of the relief obtained would be $1,986,263,000 (the purported value of AT&T's no longer collecting Internet-access taxes) plus $956,160,000 (the cash recovered), for a total of $2,942,423,000.  10% of this amount would be $294,242,300.  Because this figure is greater than $239,040,000 (25% of the cash recovered), Class Counsel's fees would equal the latter amount.

_____

[2] Dr. Landes's expert report estimated the value to Class Members of AT&T's agreement to stop collecting the challenged taxes to be approximately $2.02 billion.  (R. 163-2 at 2.)  At the March 10, 2011, hearing, however, Dr. Landes revised her estimate downwards in light of new financial information that became available to her after she had completed her expert report.

Assuming *arguendo* that Class Counsel only obtain 50% of the maximum recovery, then of the actual cash recovered ($478,080,000, which is half of $956,160,000), 25% would be $119,520,000.  10% of the aggregate value of the relief ($1,986,263,000 plus $478,080,000) would (supposedly) be $246,434,300.  Class Counsel would thus receive $119.52 million in attorneys' fees.  If they were to obtain only 10% of the total possible refunds, of the actual cash recovered ($95,616,000), 25% would be $23,904,000.  10% of the aggregate value of the relief ($1,986,263,000 plus $95,616,000) would be $208,187,900.  Class Counsel would thus receive fees of $23,904,000.  If they failed to recovery any cash for the Class, under this fee structure, Class Counsel would receive no fees.[3]  (R. 164-1 at 5.)

### B.  The Sought-After Attorneys' Fees Are Unreasonably High

This case requires the Court to determine reasonable attorneys' fees in decidedly unique circumstances.  Save for the relatively modest sum it retained in vendor's compensation (an amount it will give back pursuant to the Agreement), AT&T did not hold onto the Internet taxes it collected allegedly in violation of the ITFA.  Due in part to this fact, the Settlement requires the parties to cooperate in an effort to recoup the taxes from the relevant taxing jurisdictions—the ultimate recipients of what Plaintiffs allege to be illegally charged taxes.  As a

---

[3] Given the relative value of AT&T's no longer collecting the relevant taxes (as calculated by Dr. Landes) vis-à-vis the possible cash amounts that the parties can collect in refunds, Dean Klonoff testified at the fairness hearing that the "10% of the aggregate value of the relief obtained for each Subclass" provision is superfluous.  If Dean Klonoff were correct in this regard, Class Counsel would effectively be requesting fees equal to "25% of the actual cash recovered for each Subclass."  As the Court explains below, however, Dr. Landes's calculation of the value to the Class Members implicitly assumes that, but for the Settlement Agreement, AT&T would have continued to collect the challenged taxes.  Because evidence exists that AT&T would not have continued that collection, Dr. Landes's estimate overstates the Agreement-specific value to the Class.

result, the Court must determine reasonable attorneys' fees without knowing the cash amount that Counsel will ultimately realize for the Class Members. This makes calculating the optimal fee more difficult than in regular class-action settlements.

There is no way to predict the exact amount that Class Members will realize in refunds with mathematical precision. It is clear, however, that Counsel are likely to secure large refunds for the Class. The maximum estimated recovery would be slightly shy of a billion dollars—$956,160,000. (R. 164 at 14.) It is, of course, improbable that Counsel will succeed in obtaining every cent of that amount. If Counsel were to succeed in obtaining only half of that theoretically maximum amount, it would secure a refund of $478,080,000. If they realize merely a quarter of the maximum, Counsel would obtain $239,040,000 in refunds.

Courts often refer to class actions that involve common funds in excess of $100 million as "megafunds." *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005); *Holman v. Student Loan Xpress, Inc.*, -- F. Supp. 2d --, 2011 WL 940240, at *11 n.8 (M.D. Fla. Mar. 17, 2011); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-CV-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005); *In re HPL Techs., Inc. Secs. Litig.*, 366 F. Supp. 2d 912, 925 (N.D. Cal. 2005); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998). It is certainly probable that the amount that Counsel will recoup for the Class will exceed $100 million. Indeed, if Counsel succeed in obtaining merely 10.5% of what they estimate to be the maximum recovery, the ensuing fund would surpass $100 million.

The Seventh Circuit has directed district courts to estimate the market price for legal services in calculating an appropriate attorneys' fee. *See Synthroid I*, 264 F.3d at 718. One

factor highlighted by the Seventh Circuit is "the normal rate of compensation in the market at the time." *Id.* A number of empirical studies on class-action attorneys' fees are relevant to determining this market-compensation figure.

### 1. 25% of the Cash Realized for each Subclass Is Unreasonable

In 2004, following an examination of two data sets covering class actions from 1993 to 2002, Theodore Eisenberg and Geoffrey Miller found that, for cases with recovery ranges that exceeded $190 million (the highest decile), the mean fee awarded was 12% and median fee was 10.1% in cases for which published-opinion data was available. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 73 (2004). For Class Action Reports Data ("CAR") cases involving recoveries in excess of $190 million, Eisenberg and Miller found the mean fee to be 16.4% and the median fee to be 17.6%. *Id.* For the second-highest decile, which involved a recovery range from $79 million to $190 million, the published-opinion data revealed a mean fee of 17.6% and a median fee of 15%. For CAR cases, the mean was 20.3% and the median was 20.8%. *Id.*

More recently, Brian Fitzpatrick studied every federal class-action settlement in 2006 and 2007. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010). He found that for cases involving settlements greater than $72.5 million, the mean fee award was 18.4% and the median was 19%. *Id.* at 839. Fitzpatrick also studied the largest class-action settlements in which courts used the percentage-of-the-settlement method, with or without conducting a lodestar cross-check. *Id.* For settlements in the amount of $100 million to $250 million, he found that the mean fee was 17.9% and that the median was 16.9%. *Id.* For settlements of $250 million to $500 million, the mean

fee was 17.8% and the median was 19.5%. *Id.* With respect to settlements from $500 million to $1 billion, the mean and median awards were both 12.9%.

Class Counsel seek fees in the amount of "the lesser of 10% of the aggregate value of the relief obtained for each Subclass or 25% of the actual cash recovered for each Subclass." (R. 124 at 1) (emphasis omitted). The Court addresses the "10% of the aggregate value of the relief" provision below. Limiting the sought fee to "25% of the actual cash recovered for each Subclass," however, it is clear that this award significantly exceeds the "the normal rate of compensation in the market" for class actions involving funds of comparable size.

Even if Class Counsel recover only one-fifth of the maximum refund that they expect to be able to recover, that refund would still exceed $190 million, which is the highest decile for recovery ranges reported by Eisenberg and Miller. The 25% fee sought by Class Counsel greatly exceeds the mean (12%) and median (10.1%) fees in the published-opinion data that Eisenberg and Miller analyzed. The 25% fee requested by Counsel also significantly exceeds the mean (16.4%) and median (17.6%) fees in the CAR cases with recoveries over $190 million studied by Eisenberg and Miller.

In the event of a one-fifth recovery (slightly over $190 million), Class Counsel's requested 25% fee would also be much larger than the mean (17.9%) and median (16.9%) fees awarded in cases from 2006 and 2007 studied by Fitzpatrick that involved comparable recoveries ($100 million to $250 million).

Should Class Counsel succeed in recovering more than 20% of the maximum sought-after refund, the disparity between Counsel's requested fee and the mean and median fees awarded in class actions involving comparable settlement amounts would be greater still. Given

the well-thought-out nature of the Settlement Agreement, and based on the witnesses' testimony at the fairness hearing, it is certainly anticipated that Counsel will succeed in obtaining significantly more than 20% of the maximum refund.

Given these factors, the 25% component of the award is unreasonable. It could not be the case that the market price for Counsel's services in conducting the instant litigation and recovering the full refunds available in light of statutes of limitations would be $239,040,000, to be split between 92 cooperating attorneys for an average of $2,598,261 each. True, Counsel introduced the testimony of Donald Sipple, a Class Representative, at the fairness hearing to the effect that he had no problem "at all" with the Court's awarding attorneys' fees up to a maximum of 25% of the cash recovered for the Class. Mr. Sipple testified, however, that he has had "a long friendship" with Mr. Robertson before this case began. *See generally In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011) (noting, with apparent approval, the special master's observation "that named plaintiffs are usually cat's paws of the class lawyers").

### 2. Class Counsel Overestimate the Value to the Class Members Realized by the Settlement

In requesting that the Court approve the sought fee, Counsel place great emphasis on the alternative nature of the fee. (R. 164.) Because Dr. Landes calculated the value of the "going-forward" relief to the Class at close to $2 billion, Counsel submit that the maximum possible fee of $239,040,000 (25% of the maximum cash value) represents only "8.03% of the maximum aggregate value of the settlement." (*Id.* at 13-14.) They further observe that, as the cash recovery decreases, the percentage of the total value of the Settlement represented by the attorneys' fee shrinks disproportionately. (*Id.* at 14.)

Dean Klonoff testified at the fairness hearing in support of Class Counsel. He agreed that

"the maximum [attorneys'] fees that could ever be paid if every penny of potential tax revenue is actually collected is 8.1 percent of the value of the settlement[.]" Dean Klonoff pointed out, however, that it will likely "be something below eight percent." He also stated that he prefers "to talk about the 8 percent and not the 25 percent because the 25 percent is only 25 percent of the cash, but the cash is just one part of the overall settlement."

The value of the Settlement Agreement in requiring AT&T to cease collecting Internet-access taxes is therefore central to Counsel's claim that its requested fee is reasonable. Unfortunately, the $1.98 billion figure calculated by Dr. Landes, and relied on by Counsel and Dean Klonoff, is not a value that is specific to the Agreement.

In both her report and in her testimony at the fairness hearing, Dr. Landes carefully and convincingly explained her methodology in calculating the value to the Class of AT&T's no longer collecting the relevant taxes. The Court credits her conclusion as to this value. To be relevant to the instant request for attorneys' fees, however, the value must specifically relate to the Settlement. Assume, for example, that AT&T would have immediately ceased its Internet-access-tax collection independent of the Agreement. In that case, $1.98 billion would be a good estimate of the value of that cessation, but the Settlement Agreement would account for $0 of that value.

Dr. Landes's analysis, and Class Counsel's and Dean Klonoff's reliance on the same, implicitly assumes that the Settlement is a but-for cause of AT&T's decision to cease collecting the relevant taxes. There is considerable evidence, however, that AT&T would have discontinued the tax collection even without the Agreement. In the first place, there is a very real question whether the company's charging Internet-access taxes to its customers violated the

Internet Tax Freedom Act ("ITFA"). Ongoing potential violations would have hardly been costless to AT&T. Indeed, its prior actions in collecting those taxes invited a wave of lawsuits that culminated in the instant MDL. It is far from clear that a company would rationally continue such a potentially unlawful practice and thus face the prospect of ongoing liability.

In addition, AT&T is a company operating in a competitive industry, and thus it faces incentives to reduce price to consumers. Competition would create a strong incentive for AT&T not to collect taxes that it legally did not have to collect. Consistent with this, Dean Klonoff convincingly testified at the fairness hearing as follows:

> I don't think AT&T has any strong interest, by the way, right now in starting [to] tax again. I mean, it's a competitive industry. The last thing they want to do is be taxing and turning over money to the state and raising the price of their service. They're just going to have other people looking at their bills and switching companies or having their auditors question it.

The Court therefore finds that $1.98 billion significantly overestimates the value of the going-forward relief provided by the Settlement alone. Nevertheless, it does not follow that this aspect of the Settlement carries no value to the Class. The evidence does not reveal that AT&T would definitely have stopped charging Internet-access taxes, especially across all taxing jurisdictions. Furthermore, there is significant value to the fact that AT&T ceased charging the taxes within 30 days of the Court's preliminarily approving the Settlement. This quick response undoubtedly brought substantial value to the Class. In addition, there is value to the fact that the Settlement contractually binds AT&T not to start charging Internet-access taxes again, unless there is a change in the law. (R. 50-3 at 15.)

Because the $1.98-billion figure overinflates the value specific to the Settlement, the Court cannot calculate "10% of the aggregate value of the relief obtained for each Subclass." As

a result, the Court treats the fee request as being for a percentage of the actual cash recovered for each Subclass. In determining a reasonable percentage, however, the Court takes account of the fact that AT&T's agreement "to cease charging the challenged Internet Taxes" is a source of benefit to the Class that goes beyond the recovery of refunds, especially given how quickly AT&T terminated the tax charges.

### C. Class Counsel Are Entitled to Attorneys' Fees Equal to 20% of the Cash Recovered

Notwithstanding the fact that 25% of the cash recovered would be an unreasonable fee, Class Counsel are entitled to a generous award. This follows from (1) the significant risk of nonpayment that Counsel undertook in bringing their colorable claim against AT&T, (2) Counsel's high level of performance throughout this case, (3) the substantial amount of work that remains for Counsel to undertake, (4) the number of lawyers involved in carrying out the Settlement, and (5) other relevant factors that justify such an award. The Court concludes that 20% of the cash recovered is a reasonable estimate of the market price for Class Counsel's services in the present case.

Under this award, Counsel stand to reap great benefits should their efforts to obtain refunds from taxing jurisdictions prove effective. If they obtain the maximum refunds that are potentially available, their fee would be $191,232,000. If they get only one-half of the maximum possible refund, their fee would be $95,616,000. Should they procure a mere one-quarter of the maximum refund amount, their fee would be $47,808,000. Attorneys' fees of 20% of the cash recovered for each Subclass thus equate to a lucrative return for Class Counsel.

It bears noting, of course, that 20% of the cash recovered for the Class exceeds the mean and median fees awarded by courts in cases involving comparable returns, as found by the

empirical studies referenced above. There are nevertheless two broad reasons why a 20% reward is appropriate in this case. First, although Dr. Landes's estimated value to the Class from the cessation of Internet-tax collection overstates the specific value realized for the Class from the Settlement Agreement, the Class does benefit significantly from AT&T's agreement to cease charging the challenged taxes in a very timely manner. This benefit justifies a larger percentage-of-the-fund award than would be appropriate if the value to the Class were limited solely to the cash recovered.

Second, and as explained immediately below, the risk of nonpayment that Counsel agreed to bear, the quality of their performance, the amount of work necessary to resolve the litigation, the number of lawyers necessary to implement the Settlement, and the stakes of the case support an award of 20% of the cash refunds recovered.

### 1. Class Counsel Incurred a Significant Risk of Nonpayment

As the Court explained in detail in its Memorandum Opinion and Order approving the Settlement Agreement, Class Counsel faced a variety of potentially serious obstacles to success in bringing this lawsuit. First, and as explored above, the law is unsettled as to whether the ITFA permits a private cause of action. *See* 47 U.S.C. § 151 (1998) (as amended) (not explicitly authorizing a private right of action). Class Counsel would have had to establish that there was "clear evidence" that Congress intended the ITFA to provide for an implied cause of action. *See also Iqbal*, 129 S. Ct. at 1948 (observing that "implied causes of action are disfavored").

Second, not all states have consumer-protection laws that permit class actions, and other relevant provisions of state law differ in material ways. Third, AT&T may have successfully forced the Class Representatives to arbitrate their claims, thus defeating the class action. *See,*

13

*e.g.*, *Fensterstock*, 611 F.3d at 129 ("Arbitration replaces the right to go to court, including the right to a jury and the right to participate in a class action or similar proceeding."). Fourth, Class Counsel would have to meet the certification requirements of Rule 23, including showing that the case would be manageable for trial. *See* Fed. R. Civ. P. 23(b)(3)(D); *cf. Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.")

Fifth, Class Counsel would have had to demonstrate that "grandfather" provisions did not render Defendant's collection of the relevant taxes legal. Sixth, AT&T could potentially have raised the voluntary-payment doctrine as a defense. *See, e.g.*, *Spivey*, 622 F.3d at 821. Seventh, some states prohibit actions against vendors that improperly collect tax. *See, e.g.*, *Heaven v. Rite Aid Corp.*, 2000 WL 33711049, at *4 (Pa. Com. Pl. Oct. 27, 2000) (noting that "a purchaser cannot bring a class action suit against a vendor for a refund of sales taxes" and holding that "Respondents are merely collecting agents and, legally, can play no role in the refund of these taxes. Therefore the petition for review fails to state a cause of action as to these three respondents").

These difficulties posed a genuine obstacle to Class Counsel's receiving payment in bringing the instant suit. In addition, given the scale of the present case, Class Counsel faced almost-assured resistance from AT&T, which in turn was likely (and, in fact, did) hire top-flight counsel. A formal discovery process would have been highly laborious and, hence, costly. Class Counsel observe that the case might affect a significant fraction of the U.S. population, and note that discovery could have involved potentially comparing the results of 3 billion telephone-

number-specific tax calculations to the actual amounts of taxes paid. (R. 164 at 17.) Class notice, which AT&T ultimately paid for pursuant to the Settlement Agreement, could have cost Class Counsel millions of dollars in itself. Furthermore, due to the complexity of the case and amount potentially at issue, the proceedings were likely to be protracted.

Combined, these factors demonstrate that Class Counsel undertook an expensive, complex, and lengthy process, the likely success of which was far from guaranteed.

### 2. Class Counsel's Performance Has Been of High Quality

Class Counsel have navigated a difficult MDL and have negotiated a Settlement Agreement that provides significant benefits to the Class Members. They brought the relevant cases on their own volition, and were not simply following an initial government investigation or other proceeding that revealed the allegedly improper collection of the relevant taxes.

In light of the difficulty of success at trial, a settlement that ensures that the challenged behavior is at an end and that puts in place a mechanism that is likely to bestow the Class with considerable cash recovery in the form of refunds is an attractive agreement indeed. The Court further credits Dean Klonoff's expert opinion that "[t]he performance of class counsel was exceptional." (R. 164-1 at 21.) Furthermore, the Court notes the high quality of Class Counsel's performance before it.

### 3. The Amount of Work Necessary to Resolve the Litigation Suggests that a 20% Attorneys' Fee Is Reasonable

A fee equal to 20% of the cash recovered in each Subfund will reward Class Counsel generously if they successfully obtain most of the refunds they seek. Indeed, it is an attractive feature of the fee structure that Class Counsel "always ha[ve] an incentive to seek more for their clients." *Synthroid I*, 264 F.3d at 721.

It is not a requisite of reasonable attorneys' fees that Class Counsel engage in laborious litigation over many years. Instead, it is a question of what the Class Members and Counsel would have agreed to ex ante in an arm's length negotiation. *In re Continental*, 962 F.2d at 572. In the present case, given the strength of AT&T's defenses, the complexity of the likely litigation, the length of time for which proceedings were likely to endure, and the considerable expense involved in filing the lawsuit and ultimately bringing it to a close, the Court concludes that the parties would have agreed to a fee of 20% of the cash recovered in each Subfund.

Nor, the Court hastens to add, has this case been devoid of effort on Class Counsel's part. This case grew from two small law firms to 40 cases in 38 jurisdictions. (R. 164 at 21-22.) Ninety-two lawyers are now involved in implementing the Settlement. Class Counsel have conducted sustained research regarding the differing state laws of these jurisdictions and have engaged in informal discovery. (*Id.*) They have monitored the notice carried out by Defendant, and have paid for the 1-800 number for Class Members who wished to learn more about the case, the website that provided similar information, and the interim administrative efforts of ARPC. In addition, Counsel made clear at the fairness hearing that the 92 lawyers will be paid from the refunds obtained. Class Counsel negotiated with AT&T for almost six months before arriving at the Agreement presently before the Court.

An important feature of this unique case is that the Settlement calls for considerable ongoing efforts. Class Counsel's endeavors in this matter will not come to an end simultaneously with this Court's approval of the Agreement. Instead, working with Cooperating Counsel and AT&T, they will work to succeed on the more than 2,000 refund applications that they have filed with 1,193 taxing authorities. (R. 164 at 23.) The Agreement puts in place a

framework by which the parties will work together should they encounter difficulty in securing refunds from any particular jurisdiction. This is important because, given the number of taxing jurisdictions involved, it is probable that not all refund applications will be immediately fruitful.[4] At the fairness hearing, Mr. Robertson credibly testified that slightly more than 50% of the work involved in fully implementing the Settlement Agreement remains to be done. Dean Klonoff's report also observed that "[m]ost of the work remains to be done" and that "counsel are likely to spend tens of thousands of hours administering this settlement, should the Court grant final approval." (R. 164-1 at 6.)

This factor supports a generous reward because it is necessary to ensure that Counsel have a sufficient pecuniary incentive to undertake the necessary costly efforts needed to procure refunds from taxing jurisdictions that oppose refund requests. The Court finds that a 20% fee creates an adequate incentive in this respect.

### 4.    The 20% Fee Will Compensate 92 Lawyers

It bears emphasizing that an attorneys' fee equal to 20% of the cash recovered in each Subfund will compensate a significant number of attorneys. Indeed, 92 lawyers are currently involved in implementing the Settlement Agreement, and the relevant award will be divided amongst each of them.

### 5.    The Stakes of the Case Suggest that a 20% Fee Is Reasonable

The Court also observes that the stakes in the case are exceptionally large given the scale of the challenged activity, the complexity and costs of the legal proceedings, the amount of

---

[4] Indeed, some states' amicus briefs suggest that they are likely to oppose the parties' refund requests. In this respect, the Settlement calls for considerable ongoing efforts on the part of Class Counsel and the parties.

money involved, and thus the potential loss to Class Counsel should they have litigated the case to judgment and not prevailed (and, indeed, to AT&T should it have lost at trial).

###### 6.    Further Evidence Reveals that a 20% Award Is Reasonable

Comparing a 20%-of-the-cash-recovered award to relevant benchmarks further supports the Court's finding that the 20% fee is reasonable.  First, named Plaintiffs in the present case agreed to pay a 33.3% contingent fee.  (R. 164-4; R-164-5; R. 164-6.)  The other Class Representatives have filed declarations starting that a greater-than-25% contingent fee would be acceptable to them and would fall within the range that they would have expected to pay ex ante. (R. 164 at 25.)  As noted above, though, the Court does not put great weight on this evidence.

Second, a number of commun-fund decisions within the Seventh Circuit's jurisdiction are pertinent.  *See Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (finding that the district court was within its discretion in awarding lead counsel 30% of a $7.25 million settlement fund); *In re Synthroid Mktg. Litig.* (*Synthroid II*), 325 F.3d 974, 980 (7th Cir. 2003) ("We . . . give consumer class counsel 30% of the first $10 million and 25% of the next $10 million. . . from $20 million to $46 million, consumer class counsel is entitled to 22% of that portion of the recovery.  And we think that 15% of all amounts over that is a decent estimate of the fee that would have been established in ex ante arms'-length negotiations.  Because the consumer class recovered a total of $88 million, the fee comes to $17.52 million, or 19.9% of the fund."); *Meyenburg v. Exxon Mobil Corp.*, No. 05-CV-15, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("The Court is independently aware that 33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation."); *Abrams v. Van Kampen Funds, Inc.*, No. 01-CV-7538, 2006 WL

163023, at *7 (N.D. Ill. Jan. 18, 2006) ("This bench has previously found that 25% is the median fee award in cases involving recoveries of $5-$15 million.  The present case is in a somewhat higher category, with the gross recovery being $31,500,000.  However, . . . 25% of the net recovery will be considered the median fee award in the present type of case.  The court will award fees based on that percentage unless the specific circumstances of this case call for a higher or lower award."); *Gaskill v. Gordon*, 942 F. Supp. 382, 388 (N.D. Ill. 1996) ("[T]he Court concludes that the professionals should recover 38% of the total fund available for distribution.  This award reflects an increase of five percent over the court's original award of 33% and exceeds the range of most common fund fee awards.") (citing *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993) for the proposition that "common fund awards typically fall between twenty and thirty percent"); *Goldsmith v. Tech. Solutions Co.*, No. 92-CV-4374, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) ("Thirty-three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients.").  Although the Court does not place significant weight on this factor in light of the fact that the present case displays many unique qualities, it nevertheless deems it relevant. *Cf. Taubenfeld*, 415 F.3d at 600 ("[A]ttorneys' fees from *analogous* class action settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court.") (emphasis added).  The Court approves an attorneys' fee in the amount of 20% actually recovered for each Subfund.  *Cf. Synthroid I*, 264 F.3d at 718 ("We have never suggested that . . . as a matter of law no recovery can exceed 10% of a 'megafund[.]'").

### D.      A Lodestar Approach Would Be Misleading in the Present Case

The Court agrees with Class Counsel and Dean Klonoff that a lodestar cross-check is

unnecessary in the present case. (R. 164-1 at 6.) In particular, and as noted above, Counsel will likely have much work to do after the Settlement in dealing with the refund requests pending in the myriad taxing jurisdictions. Indeed, Dean Klonoff observes that "counsel are likely to spend tens of thousands of hours administering this settlement, should the Court grant final approval." (R. 164-1 at 6.) This suggests that a lodestar approach may be both difficult and misleading. (*Id.* at 12, 23-25.)

Ultimately, the Court concludes that a 20% award is reasonable. The Court does not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) ("It bears reiterating here that we do not believe that the lodestar approach is so flawed that it should be abandoned. . . . We therefore restate the law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court. We recognize here . . . that there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."); *Will v. Gen. Dynamics Corp.*, No. 06-CV-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a commun fund is unnecessary, arbitrary, and potentially counterproductive."); *see also Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 526 n.10 (1st Cir. 1991) ("We are aware of the tendency exhibited by some courts, particularly in common fund cases, to jettison the lodestar in favor of a 'reasonable percentage of the fund' approach.") (citations omitted).

## II.     The Court Grants Class Counsel's Motion for Costs and Expenses

Class Counsel seek reimbursement for their out-of-pocket expenses, which they

characterize as being "directly related to the business of and on behalf of the interests of the Class." (R. 164 at 31.)

The Court previously took issue with a number of items, included four-figure sums at prominent restaurants, that Counsel originally submitted for reimbursement. After the fairness hearing, where the Court made its concerns known, Counsel wisely filed revised expense records that cap all meal expenses at $50 per person. (R. 184 at 1.) They now seek, on behalf of all cooperating counsel, total reimbursement in the amount of $926,466.69. (R. 184-1 at 1.)

The expense reports and Counsel's explanation of the same at the fairness hearing are sufficiently detailed to allow the Court to determine their reasonableness. *See Synthroid I*, 264 F.3d at 722 ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more."). The Court has examined the expense reports closely, and finds them reasonable. Illustratively, the "Analysis Research Planning Corporation" charge for $123,520.92 and "Expert Advanced Telecom" charge in excess of $100,000 cover costs for the interim-settlement administrator and the 1-800 number and website construction for the Class Members.

In light of Counsel's revisions, which satisfactorily address what were unreasonable reimbursement requests, Counsel's requested costs and expenses in the amount of $926,466.69 are reasonable. The Court also observes a 2004 empirical study, which found that "[c]osts and expenses for the sample as a whole were, on average 4 percent of the relief for the class[.]" Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 70 (2004). Defining "relief" as the cash refunds recovered from the relevant taxing jurisdictions, then for Counsel's requested costs and

expenses to equal 4% of that relief, Counsel would have to succeed in obtaining only $23,161,667 in refunds, which is less than 2.5% of the maximum sought recovery.

The Court therefore grants Counsel's motion for costs and expenses.

## III.    The Court Grants the Motion Seeking Incentive Awards for Class Representatives

Class Counsel have requested incentive awards for the Class Representatives in the amount of $5,000 each.  (R. 164 at 31-32.)  Counsel submit that "each Class Representative stood ready and was committed to go through discovery as necessary, to be a part of any trial that would follow, reviewed the settlement agreement and approved it, and has also considered and approved the fee application filed in this case."  (*Id.* at 32.)  Counsel thus argue that "[t]he possibility of an incentive award, not only to compensate for time actually spent, but for the willingness to come forward on behalf of others, is deserving of the modest incentive award of $5,000[.]"  (*Id.*)  A number of objectors, however, disagree.  (R. 116 at 6; R. 132 at 3; R. 143 at 10-11.)  A $5,000 award is improper, one objector specifically argues, because the Class Representatives "never had to respond to a single discovery request or deposition."  (R. 143 at 10.)

Incentive payments sufficient to induce a named plaintiff to participate in the lawsuit are appropriate within the Seventh Circuit.  *See In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992).  Given the circumstances of the present case, the $5,000 award is appropriate.  *See Hopson v. Hanesbrands, Inc.*, No. 08-CV-844, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) ("In general, courts have found that $5,000 incentive payments are reasonable."); *see also Equal Rights Crt. v. Wa. Metro. Area Transit Auth.*, 573 F. Supp. 2d 205, 214 n.10 (D.D.C. 2008) ("The incentive awards of $5,000 and $1,000 granted to named plaintiffs and deposed

class members are not uncommon in class action litigation."); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 118 (E.D. Pa. 2005) (approving incentive payments of $5,000 to each class representative); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010) (same); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 412 (E.D. Wis. 2002) (same). *See generally Simon v. Toshiba Am.*, No. 07-CV-6202, 2010 WL 1757956, at *5 (N.D. Cal. Apr. 30, 2010) ("In this district, incentive payments of $5,000 are presumptively reasonable.").

Given that the parties undertook no formal discovery, the Class Representatives' roles were largely prospective in that they were "committed to go through discovery as necessary, to be a part of any trial that would follow." (R. 164 at 32.) Nevertheless, their role in reviewing, considering, and approving the Settlement Agreement and fee application, and especially their willingness to take a more-active role if necessary, warrants a $5,000 reward. *See, e.g.*, *Stuart v. Radioshack Corp.*, No. 07-CV-4499, 2010 WL 3155645, at *7 (N.D. Cal. Aug. 9, 2010) (finding a $5,000 incentive payment to be reasonable because "the class representatives . . . were willing and ready to go to trial"). The Court also credits Dean Klonoff's observation that a "$5,000 payment per class representative is far below the mean incentive payment (approximately $16,000) found in scholarly empirical articles." (R. 164-1 at 7.) Although this case involves a significant number of class representatives, this factor does not render the $5,000-per-Representative amount unreasonable. As Dean Klonoff noted, the Representatives "made it possible for counsel to bring class actions on behalf of class members in 44 states and territories." (*Id.*)

The Court therefore grants Counsel's motion seeking incentive awards for Class

Representatives.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Class Counsel's

motion for approval of attorneys' fees, costs, and expenses, and for approval of incentive awards

for Class Representatives (R. 124).


Dated: June 2, 2010

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**